605 A.2d 1017

**Won Gee LEE**

v.

**DENRO, INC.**

**No. 1198 Sept. Term, 1991.**

Court of Special Appeals of Maryland.

May 7, 1992.

James L. Kelley, Rockville, for appellant.

David C. Driscoll, Jr. (Brian G. Kim and Stein, Sperling, Bennett, De Jong, Driscoll, Greenfeig & Metro, P.A., on the brief) Rockville, for appellee.

Argued before MOYLAN, ALPERT and MOTZ, JJ.

MOTZ, Judge.

The single question presented by this appeal is whether an at will employee may sue her employer for wrongful or abusive discharge because she was fired when she "disputed the company's test procedures" in the presence of an inspector from the Federal Aviation Administration (FAA). Since the allegations in the employee's complaint do not demonstrate that she was discharged in "violation of a clear mandate of the public policy of this State," *Adler v. American Standard Corp.*, 291 Md. 31, 44, 432 A.2d 464 (1981), we affirm the order of the Circuit Court for Montgomery County (Miller, J.) dismissing the complaint for failure to state a claim.

(i)

Appellant, Won Gee Lee ("Lee"), was employed as an at will employee, a systems test engineer, by appellee, Denro, Inc. ("Denro"), from August 28, 1978 until April 23, 1990. Denro specializes in the development, manufacture, and service of electronic systems communications equipment; among the chief customers of Denro's testing equipment is the FAA. Lee's responsibilities included testing and trouble shooting in Denro's systems testing department. According to her complaint, Lee was "conscientious in the performance of her duties," and always followed prescribed "testing procedures." From time to time, Lee brought deviations from these procedures by other employees to their attention, or to the attention of her supervisors. (While Lee uses these terms throughout the complaint, she does not describe the "testing procedures," nor does she describe in what ways the "testing procedures" were "deviated from.")

On April 20, 1990, Lee was assigned to work with Hai Tran ("Tran"), another Denro employee, to perform the final two tests on a communications system designed for use by air traffic controllers. Lee alleges that she "did not

have a good opinion of Tran's work." She further alleges that on unspecified earlier occasions, she was working with Tran "when he deviated from a prescribed procedure." On one occasion, an FAA inspector was present and Lee pointed out the alleged deviation from procedure in front of the inspector who, according to the complaint, agreed with her.

On April 20, Tran was to have the lead responsibility in conducting the remaining two tests and Lee was assigned to assist Tran by recording data as he performed the tests. Lee "noted that [Tran] sometimes was not following the testing procedures prescribed in Denro manuals. He seemed not to know what he was doing, and to be guessing without consulting the manuals." When the director of the manufacturing department, Jeff Clute, came into the testing area, Lee brought Tran's alleged departure from procedures to his attention and asked to be transferred to another assignment. Clute denied her request for transfer, and told her "to take up her problem with her immediate supervisor." Clute also told her that the testing assignment on which Tran and Lee were working had to be "finished as soon as possible." Lee does not allege that she subsequently asked her immediate supervisor for a transfer.

Rather, she simply alleges that an accelerated test schedule was then implemented, requiring that she work the next day, Saturday, April 21, 1990, with Tran. According to the complaint, Lee and Tran "were to demonstrate to the FAA inspector compliance with the remaining two tests." Prior to the demonstration, Lee alleges that she smelled "the resistor burning in the JAX channel" and that she knew "this meant that Tran had put a jumper in the wrong place." Lee asserts that Tran was aware of his mistake and said to her, "in substance, 'Shut your mouth! Don't tell the boss! Don't tell the inspector! Don't tell the FAA!'" She further alleges that Tran asked her to replace the burned resistor and she refused. Tran then made the adjustment of the jumper and replaced the resistor. Only after these adjustments were made, according to Lee's complaint, did the FAA inspector come to the testing area.

The demonstration was then performed successfully, and the system passed the next-to-last test. One more test remained, which, due to an unanticipated system failure, could not be performed that day.

On the following Monday, April 23, 1990, Denro gave Lee a letter advising her that she was terminated, effective immediately, because:

> ... You jeopardized the completion and results of a factory acceptance test of one of Denro's FAA systems when you disputed the company's test procedures. You did this in the presence of the customer (FAA representative). His concern prompted further investigation which revealed that on the preceding day you had been informed by Jeff Clute that testing had to go on as scheduled. Your actions constitute[d] gross misconduct and cannot be accepted.

In addition, Lee alleges that "[o]n information and belief," as a result of alleged, unspecified difficulties "in meeting FAA safety standards ... [t]he FAA's level of confidence in quality assurance and control at Denro was below expected levels." She asserts that "[w]hen the FAA first assigned resident inspectors to the Denro facility" her immediate supervisor instructed his subordinates "to bring their problems to him" and that "in context" this meant the supervisor "was clearly implying that employees were not to discuss any safety concerns with FAA inspectors." Lee further asserts that her supervisor's directive to bring problems to him reflects Denro's alleged policy of "prohibiting its employees from raising safety concerns with the FAA, particularly FAA resident inspectors." She does not assert any pattern of stifling conduct by Denro. Finally, Lee alleges that Denro's termination of her employment contravened "a clear mandate of United States public policy: *promotion of maximum achievable safety in air transportation*" (emphasis in original). Specifically, she asserts that "Denro's conduct, as alleged herein" violated two federal criminal statutes, 18 U.S.C. §§ 1001 and 1505.

The circuit court found the facts alleged by Lee to be insufficient to state a cause of action for wrongful termination in accordance with the principles set forth by the Court of Appeals in *Adler v. American Standard Corporation, supra.* The court below held, "This is an internal dispute [between] the employer and employee. Given that fact, the Court is of the opinion that Counts 1 and 2 fail to state a cause of action." [1]

Because Lee's suit against Denro was disposed of on a motion to dismiss, we must assume the truth of all well-pleaded facts in her complaint, as well as inferences which may reasonably be drawn from those well-pleaded facts. *Wimmer v. Richards,* 75 Md.App. 102, 105, 540 A.2d 827 (1988); *see also Flaherty v. Weinberg,* 303 Md. 116, 136, 492 A.2d 618 (1985). If any material facts alleged in Lee's complaint tend to support her right to recover, the order to dismiss must be reversed; we limit our consideration, however, to allegations of fact and the inferences deducible from them, and not "merely conclusory charges." *Parker v. The Columbia Bank,* 91 Md.App. 346, 604 A.2d 521 (1992); *Yousef v. Trustbank,* 81 Md.App. 527, 536, 568 A.2d 1134 (1990) (*quoting Berman v. Karvounis,* 308 Md. 259, 265, 518 A.2d 726 (1987)).

### (ii)

This case presents the "familiar common-law problem of deciding where and how to draw the line between claims that genuinely involve the mandates of public policy and are actionable, and ordinary disputes between employee and employer that are not." *Sheets v. Teddy's Frosted Foods, Inc.,* 179 Conn. 471, 427 A.2d 385, 387 (1980). Prior to *Adler,* Maryland strictly adhered to the general common

---

1. In her complaint Lee also alleged that Denro's discharge of her constituted age discrimination (Count III) and sex discrimination (Count IV). The circuit court gave her the opportunity to amend those counts; she declined to do so. On appeal she has abandoned them, noting that this appeal "focuses exclusively on the court's dismissal of the abusive discharge counts of the complaint."

law rule that, absent a statutory or contractual obligation to the contrary, either an employer or an employee may terminate the employment relationship for any or no reason. *See, e.g., State Comm'n on Human Rel. v. Amecom Div.,* 278 Md. 120, 126, 360 A.2d 1 (1976). In *Adler,* the Court of Appeals recognized, for the first time, a "narrow exception" to this rule, holding that an employee who has been "discharged in a manner that contravenes public policy" may "maintain a cause of action for abusive or wrongful discharge against his former employer." 291 Md. at 36–37, 432 A.2d 464. Maryland thus joined a growing number of states which have adopted a "public policy exception" to ordinary notions of at will employment. *See generally,* Comment, *Protecting Employees At Will Against Wrongful Discharge: The Public Policy Exception,* 96 Harv. L.Rev.1931 (1983). *See also Adler, supra,* 291 Md. at 36, 432 A.2d 464 (discussing general approaches to abusive discharge tort).

When recognizing a public policy exception to the general rule governing at will employment, Maryland also confronted, as other states have, the difficulty in identifying what constitutes a "public policy," the violation of which amounts to a cause of action against an employer by the discharged employee. *See Prince v. Rescorp Realty,* 940 F.2d 1104, 1107 (7th Cir.1991) ("Determining what is clearly mandated public policy is difficult; indeed, the concept 'has been called the Achilles heel of the principle underlying the tort of retaliatory discharge'" (*quoting Hicks v. Resolution Trust Corp.,* 736 F.Supp. 812, 815 (N.D.Ill.1990)). Generally, "public policy" has been defined as "that principle of law which holds that no one can lawfully do that which tends to be injurious to the public or against the public good." *Boyle v. Vista Eyewear, Inc.,* 700 S.W.2d 859, 871 (Mo.App. 1985).

In attempting to be more specific, the *Adler* court acknowledged that "'jurists to this day have been unable to fashion a truly workable definition of public policy,'" 291 Md. at 45, 432 A.2d 464 (*quoting Md.–Nat'l Cap. P. & P. v.*

*Wash. Nat'l Arena,* 282 Md. 588, 605–606, 386 A.2d 1216 (1978)). It then identified "legislative enactments, prior judicial decisions, [and] administrative regulations" as the chief sources of public policy. 291 Md. at 45, 432 A.2d 464. The *Adler* court further cautioned that, while courts considering claims of abusive discharge are not confined to these sources, "recognition of an otherwise undeclared public policy as a basis for a judicial decision involves the application of a very nebulous concept to the facts of the case," a practice which should be employed sparingly, if at all. *Id.* In subsequent *Adler* litigation, the United States Court of Appeals for the Fourth Circuit added, "Limitation of the claim for abusive discharge to situations involving the actual refusal to engage in illegal activity, or the intention to fulfill a statutorily prescribed duty, ties abusive discharge claims down to a manageable and clear standard." *Adler v. American Standard Corp.,* 830 F.2d 1303, 1307 (4th Cir. 1987).

Moreover, although Maryland appellate courts have decided several cases involving abusive discharge claims since *Adler,* they have never found such a claim to be stated absent a discharge which violates a public policy set forth in the constitution, a statute, or the common law. *See, e.g., Ewing v. Koppers,* 312 Md. 45, 537 A.2d 1173 (1988) (discharge of employee who exercises rights under state worker's compensation *statute* can result in abusive discharge claim); *Kessler v. Equity Management, Inc.,* 82 Md.App. 577, 572 A.2d 1144 (1990) (manager discharged for refusal to commit *common law* trespass and violate tenant's *constitutional* right to privacy can bring abusive discharge claim); *Moniodis v. Cook,* 64 Md.App. 1, 494 A.2d 212, *cert. denied,* 304 Md. 631, 500 A.2d 649 (1985) (employee discharged in violation of *state statute* for refusal to take lie detector test can bring abusive discharge claim).

(iii)

Here, Lee asserts that Denro's discharge of her violated a "clear mandate of United States public policy: *promotion*

*of maximum achievable safety in air transportation*" (emphasis in original), as evidenced by the alleged fact that Denro's "conduct" violated two federal criminal statutes, 18 U.S.C. § 1001 and § 1505.[2]

Section 1001 makes it a federal felony to knowingly and willfully "conceal or cover up by trick, scheme or device a material fact" or to make any "false, fictitious or fraudulent statements or misrepresentations" in any matter "within the jurisdiction of any ... agency of the United States". Section 1505 states, in pertinent part:

> Whoever corruptly ... or by any threatening letter or communication influences, obstructs, or impedes or endeavors to influence, obstruct or impede the due and proper administration of the law under which any pending proceeding is being had before any ... agency of the United States ... shall be fined.

Accepting as true the averments in Won Lee's complaint, they, like those in Adler's complaint, are "too general, too conclusory, too vague and lacking in specifics to amount up to a prima facie showing," *Adler*, 291 Md. at 44, 432 A.2d 464, that Denro's claimed misconduct violated either of these statutes.

The purpose of § 1001 is to protect the United States Government from fraud or deceit. *United States v. Fern*, 696 F.2d 1269, 1273 (11th Cir.1983). In order to be convicted under § 1001, a defendant must be shown to have (1) made a statement or representation that was (2) false, (3)

---

**2.** We assume without deciding that an employee can base a claim for wrongful discharge under Maryland law on an asserted violation of public policy exhibited by violation of federal statutes. *See Phipps v. Clark Oil & Refining Corp.*, 396 N.W.2d 588 (Minn.App.) *aff'd,* 408 N.W.2d 569 (Minn.1987) (employee alleging that he was discharged for refusal to violate the federal Clean Air Act by pumping leaded gasoline stated a cause of action against employer for wrongful termination); *Boyle v. Vista Eyewear, Inc.*, 700 S.W.2d 859 (Mo.App. 1985) (cause of action stated where employee alleged that she was dismissed in retaliation for filing complaints with United States Occupational Safety and Health Administration and Federal Drug Administration).

material, (4) made knowingly and willfully, and (5) made in a matter within the jurisdiction of a federal agency. *See United States v. Notarantonio,* 758 F.2d 777, 785 (1st Cir.1985). Lee does not allege that Denro made any false statement, let alone a material or willful one. Nor does she allege that Denro discharged her because she refused to make a false statement. In short, the complaint does not begin to set forth the allegations necessary to demonstrate that Denro's "conduct violated § 1001." [3]

■ Similarly, Lee's allegations do not set forth any basis for concluding that Denro's conduct violated 18 U.S.C. § 1505. That statute, the federal "obstruction of justice" statute, prohibits the influencing, obstructing or impeding "by any threatening letter or communication" of a witness in a proceeding pending before a department or agency of the United States. Lee does not allege *how* Denro affirmatively attempted to silence her or persuade her to lie to the FAA inspector or even that Denro did this. Moreover, the role of the FAA inspector, as described in Lee's complaint, does not involve an investigative or adjudicatory matter on a level necessitated under the caselaw to be considered a "proceeding" for the purposes of § 1505. *See United States v. Browning,* 572 F.2d 720, 723 (10th Cir.), *cert. denied,* 439 U.S. 822, 99 S.Ct. 88, 58 L.Ed.2d 114 (1978)

---

3. Although § 1001 has been interpreted broadly and has served as the basis for conviction in a wide variety of circumstances, it has never been applied absent a misrepresentation. *See, e.g., United States v. Oren,* 893 F.2d 1057 (9th Cir.1990) (defendant told National Park Service that he had another offer on property which NPS sought to purchase through non-profit third-party organization, when he in fact had no such offer); *United States v. Alemany Rivera,* 781 F.2d 229, 235–36 (1st Cir.1985) (hospital administrator convicted for submitting falsified documentation capable of resulting in fraudulent procurement of Department of Housing and Urban Development funds); *United States v. Chandler,* 752 F.2d 1148, 1151–52 (6th Cir.1985) (false documents submitted to Internal Revenue Service); *United States v. Carrier,* 654 F.2d 559, 561 (9th Cir.1981) (defendant lied to customs officer about amount of money he was carrying over border); *United States v. Wolf,* 645 F.2d 23, 25 (10th Cir.1981) (defendant, a distributor of oil and related products, misrepresented grade of oil on certificate required under federal regulation).

("proceeding" generally applies to investigation prior to a trial or to adjudicative functions of a department or agency); *United States v. Vixie*, 532 F.2d 1277, 1278 (9th Cir.1976) (Internal Revenue Service investigation, in which a subpoena was issued to the defendant, is a "proceeding" with the meaning of 18 U.S.C. § 1505).[4]

While Lee may personally believe that she was placed in a situation in which she was expected to commit a fraud, she has set forth no tangible basis on which we might draw that legal conclusion. Courts have refused to find that at will employees fired under such circumstances have been discharged in violation of public policy. *See Adams v. Budd*, 583 F.Supp. 711, 716 (E.D.Pa.1984) (no cause of action where employee does not identify specific hazards or injuries caused by employer's practices); *Pierce v. Ortho Pharmaceutical Corp.*, 84 N.J. 58, 417 A.2d 505, 512 (1980) (employee should not have the right to prevent employer from pursuing its business because the employee perceives that a particular business decision violates the employee's personal morals, as distinguished from a recognized statement or code of public policy). *See also Bard v. Bath Iron Works Corp.*, 590 A.2d 152, 154 (Me.1991) (allegation of employer's violation of government contract did not constitute allegation of violation of federal law).

### (iv)

■ Like the circuit court, our examination of Lee's complaint leads us to conclude that she has alleged nothing more than a normal employer-employee dispute. When a plaintiff fails to demonstrate that his or her grievance is anything more than a private dispute regarding the employer's execution of normal management operating procedures, there is no cause of action for abusive discharge.

---

4. Denro does not claim that federal law provides an exclusive remedy precluding a state law abusive discharge claim. *Compare Chappell v. Southern Md. Hosp., Inc.*, 320 Md. 483, 578 A.2d 766 (1990). *See also Meaige v. Hartley Marine Corp.*, 925 F.2d 700, 702 (4th Cir.1991).

For example, in *Geary v. United States Steel Corp.*, 456 Pa. 171, 319 A.2d 174 (1974), the Supreme Court of Pennsylvania found that a salesperson, who alleged that he was fired after he voiced his belief to management that the product he was selling had not been adequately tested and was unsafe, had not stated a cause of action for abusive discharge. After considering the employee's allegations, the court held that "there is nothing here from which we could infer that the company fired [the plaintiff] for the specific purpose of causing him harm, or coercing him to break any law or otherwise to compromise himself." *Id.*, 319 A.2d at 178. Specifically, the court found that the plaintiff's allegations that he "vigorously expressed his own point of view in the matter, by-passing his immediate supervisors and taking his case to a company vice-president," resulting in his ultimate dismissal, were insufficient to state a cause of action. *Id.* "The most natural inference from the chain of events recited in the complaint is that [the plaintiff] had made a nuisance of himself, and the company discharged him to preserve administrative order in its own house," the court said. *Id. Accord, Willcutts v. Galesburg Clinic Ass'n*, 201 Ill.App.3d 847, 147 Ill.Dec. 853, 856–57, 560 N.E.2d 1, 4–5 (1990) (physician expelled from medical clinic association after he filed suit against association for, inter alia, fraud and antitrust violations, failed to state a cause of action for abusive discharge, because he failed to demonstrate that his personal grievance was "anything more than a private dispute amongst coworkers"). In *Geary*, the Pennsylvania Supreme Court expressly noted that disruptive employee conduct does not qualify for special protection simply because it is borne of good intentions. 319 A.2d at 179. *See also Mudd v. Hoffman Homes for Youth, Inc.*, 374 Pa.Super. 522, 543 A.2d 1092, 1095 (1988) ("The praiseworthiness of (appellant's) motive does not detract from [the employer's] legitimate interest in preserving its normal operational procedures from disruption").

A number of other courts have also concluded that an employee who is dismissed for raising objections to the

employer's business, management or safety practices, even if correct in his or her allegations, does not state a cause of action for abusive discharge. *See, e.g., Percival v. General Motors Corp.*, 400 F.Supp. 1322, 1324 (E.D.Mo.1975), *aff'd*, 539 F.2d 1126 (8th Cir.1976) (no abusive discharge where employee was fired in retaliation for his attempt to correct false impressions given by the corporation to outside business associates and to urge corporate management itself to correct misleading information conveyed to public, because no clear mandate of public policy was involved); *Hibbert v. Centennial Villas, Inc.*, 56 Wash.App. 889, 786 P.2d 309, 311 (1990) (where employer articulated legitimate reasons for terminating nursing home employee, the employee had the burden of showing those reasons were a mere pretext; fact that employee had reported malfunctioning doors and the presence of foreign object in patient's medicine insufficient to meet burden); *Crockett v. Mid–America Health Services*, 780 S.W.2d 656 (Mo.App.1989) (nursing supervisor at psychiatric hospital fired after she reported defects in hospital's operations to inspectors did not state claim for abusive discharge, where she was not actually directed to misrepresent status of operations). Thus, where, as here, there is no affirmative direction by an employer that an employee violate a recognized public policy and the employee contravenes normal operating procedures in airing his or her grievances, an employer is free to discharge that employee at will.[5]

---

5. In dismissing Lee's claim, the trial court stated, "this isn't a whistleblowing case where somebody has reported, well they are making unsafe airplanes that will—and to report to the FAA or something." The court's suggestion that, in order to state a cause of action in abusive discharge, Lee must have complained directly to FAA safety authorities about a violation in safety standards, may be erroneous. The existence of public policy would not seem to depend on whether an employee articulates her grievances to government authorities. *See Wheeler v. Caterpillar Tractor Co.*, 108 Ill.2d 502, 92 Ill.Dec. 561, 565, 485 N.E.2d 372, 376 (1985), *cert. denied*, 475 U.S. 1122, 106 S.Ct. 1641, 90 L.Ed.2d 187 (1986); *Petrik v. Monarch Printing Corp.*, 111 Ill.App.3d 502, 67 Ill.Dec. 352, 356, 444 N.E.2d 588, 592 (1982).

■ Moreover, the fact that the employer does not have a good reason for the employee's discharge does not, in the absence of a clear violation of public policy, render the discharge "abusive" or "wrongful." For example, in *Percell v. International Business Machines, Inc.,* 765 F.Supp. 297 (E.D.N.C.1991), an employee complained, *inter alia,* that he was discharged because he exercised his right under the company's "open door policy" which permitted all employees to appeal the decisions of immediate supervisors to higher level management. The employee alleged that, after he appealed his supervisor's refusal to transfer him to a different work location, he was fired in retaliation for exercising his rights. The federal district court found that, even if the employee had been discharged for the reason alleged, he failed to state a cause of action for abusive discharge. "[T]he question of how defendant handled appeals of management decisions is not a matter which implicates general public policy concerns and is instead largely a matter of interest only to the private parties involved," the court said. *Id.* at 300. *See also Connolly v. Harry Macklowe Real Estate Co.,* 161 A.D.2d 520, 555 N.Y.S.2d 790, 792 (1990) (no cause of action stated where pleading failed to describe how the bad temper and erratic behavior of building manager amounted to conduct which is contrary to law, rule, or regulation, thus jeopardizing the health and safety of the public); *McLaughlin v. Barclays American Corp.,* 95 N.C.App. 301, 382 S.E.2d 836, 839 *cert. denied,* 325 N.C. 546, 385 S.E.2d 498 (1989) (even if employer's decision to discharge employee after he defended himself in physical altercation with another employee was "irrational," it did not violate public policy; suggestion that "public policy favors encouraging employees to defend themselves" was insufficient basis on which to allege abusive discharge).

A case in which an employee successfully stated a cause of action for abusive discharge illustrates the particular deficiencies in Lee's complaint. In *Sheets v. Teddy's Frosted Foods, Inc., supra,* the Supreme Court of Connecticut found that an employee stated a claim of abusive discharge

against his employer, a producer of frozen food products, because: (a) the employee, a quality control director, identified specific deviations in the employer's product from specifications contained in the employer's standards and labels, which concerned the use of substandard raw materials and underweight components in the employer's finished products; (b) false and misleading labels constituted a violation of a specific provision within the Connecticut Uniform Food, Drug and Cosmetic Act; (c) the employee notified his employer in writing as to these problems; and (d) the employee's recommendations were ignored, and subsequent to his reporting the product's deviations from the employer's labels, the employee was discharged. 427 A.2d at 386. Here, unlike the employee in *Sheets*, Lee did not allege any specific "deviations" from Denro's testing procedures. Lee did not allege how the alleged general "deviations" departed from the amorphous policy concern of "maximum achievable safety in air transportation." Lee did not allege that she articulated her concerns in writing or to her supervisor, as she acknowledges she was expressly directed to do; rather, what protesting she did was done randomly to whomever would listen. Finally, Lee does not even allege that her random objections were ignored.

Lee has not stated a cause of action for abusive discharge; the circuit court correctly dismissed her complaint.

JUDGMENT AFFIRMED.

COSTS TO BE PAID BY APPELLANT.