**Benjamin C. THOMPSON, Plaintiff**

v.

**The MEMORIAL HOSPITAL AT EASTON, MARYLAND, INC., Defendant.**

**Civil No. H–96–165.**

United States District Court, D. Maryland.

May 15, 1996.

Stephen M. Silvestri, Richard A. DeTar and Miles & Stockbridge, Baltimore, Maryland, for defendant.

ALEXANDER HARVEY, II, Senior District Judge.

In this civil action, plaintiff Benjamin C. Thompson ("Thompson") has sued his former employer, The Memorial Hospital at Easton, Maryland, Inc. ("the Hospital"). Presently residing in Wichita Falls, Texas, plaintiff was an at will employee of the Hospital from December of 1990 until April of 1993, occupying the position of Senior Radiation Physicist. From the outset, this employment relationship was characterized by conflicts and differences between plaintiff and various members of the Hospital administration. On April 24, 1993, the Hospital terminated plaintiff's employment for the stated reason that he was not certified by the American Board of Radiologists. Relying on *Adler v. American Standard Corp.*, 291 Md. 31, 432 A.2d 464 (1981) (*Adler I*), plaintiff alleges in the complaint he has filed in this Court that the Hospital subjected him to a wrongful and abusive discharge in violation of various public policies.[1] Diversity jurisdiction exists.

Presently pending before the Court is the Hospital's motion to dismiss the complaint, filed pursuant to Rule 12(b)(6), F.R.Civ.P. The Hospital contends that plaintiff has failed to state a proper claim for abusive discharge in violation of public policy, and that the complaint must therefore be dismissed. The parties have filed memoranda in support of and in opposition to the pending motion, and have submitted copies of state regulations relevant to the issues in the case. A hearing on the motion has been held in open court. For the reasons stated herein, the Hospital's motion to dismiss will be granted.

I

*Background Facts*

The allegations contained in plaintiff's complaint, taken as true for purposes of the

Stephen D. Langhoff and Langhoff & Wacker, Baltimore, Maryland, for plaintiff.

---

1. Courts have characterized this cause of action as one for "wrongful," "abusive" or "retaliatory" discharge. *See Adler I,* 291 Md. at 36 n. 2, 432 A.2d 464. The terms will be used interchangeably in this Opinion.

pending motion, are as follows. The Hospital is a Maryland corporation which operates the Regional Cancer Center in Easton, Maryland ("the Cancer Center") as an adjunct health services provider. Plaintiff began his employment with the Hospital in December of 1990 as a Senior Radiation Physicist. An at will employee, plaintiff's duties included the administering of radiological treatments to patients and the overseeing of radiological services provided by the Hospital.

On or about January 6, 1991, plaintiff became aware that the Hospital had improperly administered prescribed doses of radiation to certain patients during the period from September of 1990 to January 6, 1991. The parties agree that all of the misadministrations in question were underdosages rather than overdosages. Plaintiff immediately informed Hospital personnel "to cease administering radiation therapy using techniques substantially different from professionally accepted practices causing substantial treatment errors." (Complaint, ¶ 6). Dr. John Mastandrea, an oncologist at the Hospital, told plaintiff that he would take care of the problem. However, plaintiff subsequently learned that no action had been taken to correct the problem, and that no report of the misadministrations had been made to the Hospital's Radiation Safety Officer or to the appropriate Maryland authorities.

On March 13, 1991, plaintiff advised the Hospital's Radiation Safety Officer, its Director of Ambulatory Care Services, and also its Vice–President of Operations about the misadministrations of radiation, and he requested that the Hospital report the misadministrations to the appropriate state authorities. Plaintiff also contacted on his own the Maryland State Department of the Environment ("the DOE"). Subsequently, the Hospital's administrative personnel held a meeting in May of 1991 regarding the misadministrations, after which they instructed plaintiff to prepare a report on the misadministrations matter. Upon receiving plaintiff's report, the Hospital notified the DOE of the misadministrations.

Plaintiff alleges that throughout this period of time, Dr. Mastandrea and other Hospital personnel harassed him because he had reported incidents of misadministrations to the DOE. Plaintiff also told the Hospital that it needed to correct the records of the patients who had received improper radiation dosages. Mr. Peter Synowiez, the President of the Hospital, allegedly threatened that plaintiff could be "replaced easily" if he did not stop insisting that patients' medical records be corrected. (Complaint, ¶ 14).

As of April of 1992, the patients' records in question had not as yet been corrected. Plaintiff again raised the matter with the Hospital's Director of Ambulatory Care Services and also with the Director of the Cancer Center. However, the Hospital did nothing to correct the records of the patients who had received the radiation misadministrations. On April 28, 1992, plaintiff spoke with DOE personnel and provided further details about the misadministrations which had occurred. The following day, plaintiff informed the Hospital's Vice President of Operations about this conversation. Mr. Synowiez, the Hospital's President, "expressed anger at Plaintiff for discussing the issue with State authorities and told him not to pursue this matter any further." (Complaint, ¶ 7). Rather than drop the matter, plaintiff requested that the Hospital send appropriate letters to the affected patients or their physicians, and plaintiff also renewed his demand that the patients' records be corrected.[2]

Acting in response to information provided by plaintiff, the DOE conducted an inspection of the Hospital's facilities on July 22, 1992. In August, 1992, the DOE issued a "highly critical" letter concerning the Hospital's handling of the misadministrations in question. According to plaintiff, he was thereafter subjected to increased harassment, allegedly in an attempt to force his resignation. He asserts that he was required to track his hours each day, and that he was relieved of his duties regarding diagnostic radiology.

---

**2.** At some point, plaintiff also advised the Hospital that certain radiation equipment had been decertified for use in 1990, and that other equipment delivered radiation in excess of amounts permitted by law.

As of January of 1993, the Hospital had not yet corrected any patients' records. Plaintiff again raised the issue, but was told that the matter was closed. When plaintiff persisted in his demands that patients' records be reviewed and corrected, hospital officials began alluding to the possibility that plaintiff faced termination of his employment because of his insistence that the Hospital correct the records.

Plaintiff advised the Hospital in February of 1993 that there were certain "irregularities" in billings made by the Hospital. (Complaint, ¶ 24). According to plaintiff, the Hospital had submitted bills to Medicare for services that were not performed and for services that the Hospital was not capable of performing. Plaintiff was told that any such billing irregularities were none of his business and that he should forget about the issue.

Plaintiff again met with Hospital personnel on February 25, 1993 to discuss procedures for correcting those patients' medical records which still contained incorrect information relating to the misadministrations of radiation dosages occurring in 1990 and 1991. At the end of March, 1993, the Director of the Cancer Center told plaintiff to place a memorandum in the record of each patient who had received a misadministration of radiation. Memoranda were prepared by plaintiff, explaining the facts relating to the misadministrations in question and setting forth a record of the radiation actually received by the patient.

Almost immediately after he had inserted the allegedly correct information in the patients' charts, the Hospital advised plaintiff that the changes he had made to the medical records were inappropriate, and he was told to remove the memoranda from the records and prepare different corrections. Plaintiff agreed to prepare different correction information, but he did not remove any information which he had already placed in the records. The Hospital itself then removed from the patients' records the information which plaintiff had put in their charts.

Plaintiff's employment was terminated on April 24, 1993 for the stated reason that he was not certified by the American Board of Radiologists. Plaintiff asserts in his complaint that he was wrongfully discharged in contravention of public policy. Specifically, plaintiff claims that the termination of his employment violated in several ways Maryland public policy embodied in the Department of Environment regulations which are set forth in § 26.12.01.01 of the Code of Maryland Regulations (COMAR)[3] and that such termination also violated statutory public policy which requires a hospital to maintain accurate medical records. In his memorandum filed in opposition to defendant's motion to dismiss, plaintiff further contends that defendant has, by submitting false bills to Medicaid and Medicare, violated federal public policy embodied in the federal False Claims Act, 31 U.S.C. § 3729, *et seq.* and 42 U.S.C. § 1320a–7b.

## II

### *Plaintiff's Claims*

■ A motion to dismiss under Rule 12(b)(6), F.R.Civ.P., should be denied unless it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief. *Conley v. Gibson,* 355 U.S. 41, 45–46, 78 S.Ct. 99, 101–02, 2 L.Ed.2d 80 (1957). In determining whether to dismiss a complaint, this Court must view the well-pleaded material allegations in a light most favorable to the plaintiff, with the alleged facts accepted as true. 2A *Moore's Federal Practice,* ¶ 12.07 [2.–5.] (2d ed. 1987); 5A C. Wright & A. Miller, *Federal Practice and Procedure* § 1357, at 304–21 (1990). Accordingly, if, pursuant to *Adler I,* plaintiff has alleged facts which establish that he was fired in violation of a clear mandate of public policy, then the pending motion to dismiss must be denied.

Plaintiff's principal contention is that the Hospital violated two important public policies embodied in COMAR 26.12.01.01. First, plaintiff argues that there is a public policy

---

3. The administrative provisions in question are known as "Regulations for Control of Ionizing Radiation."

that licensed users of radiation must report known misadministrations of radiation to the DOE. *See* COMAR 26.12.01.01, § D.409(b). Plaintiff also contends that a licensed user of radiation equipment may not retaliate against a worker who reports known violations of the Maryland Radiation Act and its accompanying regulations. *See id.,* § J.16.

In addition, plaintiff is here contending that it is a clear mandate of public policy that licensed and accredited hospitals not knowingly maintain false and inaccurate medical records of their patients' radiation therapy. According to plaintiff, "[t]hese record keeping procedures are required for a hospital to obtain and maintain its accreditation in Maryland, and are also mandated by the federal Medicare/Medicaid Hospital regulations." (Complaint, ¶ 35). Finally, plaintiff has argued in his memorandum that it is a clear mandate of public policy that a hospital not knowingly submit false Medicare and Medicaid claims in violation of the federal False Claims Act, 31 U.S.C. § 3729, *et seq.* and 42 U.S.C. § 1320a–7b.[4]

### III

*Wrongful Discharge Under Maryland Law*

*Adler I* is the seminal Maryland case in which the existence of the tort of wrongful discharge was recognized for the first time by the Court of Appeals of Maryland. For an understanding of the limited scope of a cause of action for wrongful discharge asserted under Maryland law by an employee against his or her employer, it is necessary to recount the history of the *Adler* litigation. Gerald F. Adler had been terminated from his employment with American Standard, Inc., and he initially brought an action in the United States District Court for the District of New York alleging, *inter alia,* a claim for wrongful discharge. Since Adler was employed by a division of American Standard, Inc. located in Hunt Valley, Maryland, the case was transferred to this Court under 28 U.S.C. § 1404(a).[5] *Adler v. American Standard Corp.,* 478 F.Supp. 8 (S.D.N.Y.1979). This Court then certified to the Court of

Appeals of Maryland the following questions: (1) whether Maryland recognized a cause of action for abusive discharge and (2) whether Adler's allegations were sufficient to state a claim.

It had always been the recognized law in Maryland that an employment contract of indefinite duration, that is, at will, could be legally terminated at the pleasure of either party at any time. *Adler I,* 291 Md. at 35, 432 A.2d 464. After reviewing cases from other jurisdictions which recognized or declined to recognize a cause of action for wrongful discharge as a judicial exception to the terminable at will doctrine, the Court of Appeals in *Adler I* answered this Court's certified questions by first concluding that Maryland does recognize a cause of action for abusive or wrongful discharge by the employer of an at will employee "when the motivation for the discharge contravenes some clear mandate of public policy; ..." *Id.* at 47, 432 A.2d 464. However, the Court cautioned that recognition of an otherwise undeclared public policy as a basis for a judicial decision "involves the application of a very nebulous concept to the facts of a given case" and stated its awareness that the "declaration of public policy is normally the function of the legislative branch." *Id.* at 45, 432 A.2d 464. The Court cited *Patton v. United States,* 281 U.S. 276, 306, 50 S.Ct. 253, 261, 74 L.Ed. 854 (1930) for the proposition "that the theory of public policy embodies a doctrine of vague and variable quality" and "should be accepted as the basis of a judicial determination, if at all, *only with the utmost circumspection.*" (Emphasis added by Court of Appeals of Maryland). *Adler I,* 291 Md. at 46, 432 A.2d 464. Although recognizing the existence under Maryland law of the tort of wrongful discharge, the Court answered the second certified question by concluding that the allegations of the amended complaint filed by Adler in this Court did not state such a cause of action. *Id.* at 46–47, 432 A.2d 464.

Adler then filed a second amended complaint in this Court, alleging that he had been

---

4. As discussed hereinafter, there is no mention of the False Claims Act in plaintiff's complaint.

5. The case was docketed in this Court as Civil No. H–79–1783.

discharged to prevent his disclosure to management of violations of certain federal and Maryland statutes. In *Adler v. American Standard Corp.*, 538 F.Supp. 572, 579–80 (D.Md.1982) (*Adler II*), this Court denied defendant's motion to dismiss plaintiff Adler's claims of abusive discharge, concluding that Adler had alleged with sufficient particularity violations of federal tax laws and had also alleged that he had been fired to prevent the disclosure of these violations in contravention of public policy. The case then came on for trial in this Court before a jury, which awarded Adler substantial compensatory and punitive damages.

On appeal, the Fourth Circuit reversed. *Adler v. American Standard Corp.*, 830 F.2d 1303 (4th Cir.1987) (*Adler III*). Noting that "[c]ourts must use care in creating new public policy," the Fourth Circuit held that an employment termination motivated by the defendant's desire to conceal wrongdoing by preventing its disclosure by the plaintiff to higher corporate officers does not violate Maryland's public policy. *Id.* at 1304. Claims for abusive discharge must be limited "to situations involving the actual refusal to engage in illegal activity or the intention to fulfill a statutorily prescribed duty,...." *Id.* at 1307. It was the Fourth Circuit's view that such a limitation would tie abusive discharge claims down to a manageable and clear standard and would be consistent with the intention of the Maryland Court of Appeals in *Adler I* "to preserve the rights of the employer to terminate employees at will, subject only to the limited exceptions created by statute and to the relatively limited instances where a clear mandate of public policy had been violated." *Id.*

Since *Adler I*, plaintiffs have been successful in only a limited number of circumstances in attempts to state a proper claim for abusive or wrongful discharge. Inasmuch as the exception to the at will doctrine recognized by the Court of Appeals in

*Adler I* is a "narrow" one, an employee, to prevail on a wrongful discharge claim, "must demonstrate the policy in question with clarity, specificity and authority." [6] *Bagwell v. Peninsula Regional Medical Ctr.*, 106 Md. App. 470, 495, 665 A.2d 297 (1995), *cert. denied*, 341 Md. 172, 669 A.2d 1360 (1996). The Maryland cases upholding claims for wrongful discharge generally fall into the two categories outlined in *Adler I* and *Adler III*. One category includes those cases where the employee has been terminated for exercising a specific legal right or duty. *See Watson v. Peoples Sec. Life Ins. Co.*, 322 Md. 467, 588 A.2d 760 (1991) (seeking legal redress against a co-worker for sexual harassment culminating in assault and battery); *Ewing v. Koppers Co.*, 312 Md. 45, 537 A.2d 1173 (1988) (filing a workers' compensation claim); *Bleich v. Florence Crittenton Servs., Inc.*, 98 Md.App. 123, 632 A.2d 463 (1993) (carrying out a statutory duty to report child abuse or neglect); *Moniodis v. Cook*, 64 Md.App. 1, 494 A.2d 212 (refusing to take a lie detector test when a statute prohibited using a lie detector test as a condition of employment), *cert. denied*, 304 Md. 631, 500 A.2d 649 (1985). The second category involves the situation where an employee has been fired for refusing to violate the law or the legal rights of a third party. *See Kessler v. Equity Management, Inc.*, 82 Md.App. 577, 572 A.2d 1144 (1990) (refusing to commit the tort of invasion of privacy of a third person).[7]

In a number of other cases decided after *Adler I*, courts have rejected various claims alleging that the termination of the plaintiff's employment violated a clear mandate of public policy. In most instances, the employee was unable to point to a specific public policy that was violated, while in others the employee's allegations were found to be merely conclusory. *See Adler III*, 830 F.2d at 1307 (finding no clear mandate that an employee had an affirmative obligation to report or prevent crime); *McIntyre v. Guild, Inc.*, 105

---

**6.** Plaintiff concedes that a cause of action for wrongful discharge is a limited one and that a claim of this sort is to be construed narrowly.

**7.** Although the very recent decision of the Court of Appeals of Maryland in *Molesworth v. Brandon*, 341 Md. 621, 672 A.2d 608 (1996), does not

fit squarely into either of these two categories, that Court nevertheless recognized that an employee could assert a claim for wrongful discharge based on sex discrimination because "Maryland's public policy against sex discrimination is ubiquitous." *Id.* at 632, 672 A.2d 608.

Md.App. 332, 659 A.2d 398 (1995) (finding no cause of action for "acting in furtherance of the goals and interests of the False Claims Act"); *Hrehorovich v. Harbor Hosp. Ctr., Inc.,* 93 Md.App. 772, 614 A.2d 1021 (1992) (finding no clear mandate for promotion of quality health care system), *cert. denied,* 330 Md. 319, 624 A.2d 490 (1993); *Lee v. Denro, Inc.,* 91 Md.App. 822, 605 A.2d 1017 (1992) (finding no clear mandate for promotion of maximum achievable air safety).

In this case as in all wrongful discharge cases brought under Maryland law, this Court is faced with the "familiar common-law problem of deciding where and how to draw the line between claims that genuinely involve the mandates of public policy and are actionable, and ordinary disputes between employee and employer that are not." *Lee,* 91 Md.App. at 828, 605 A.2d 1017 (quoting *Sheets v. Teddy's Frosted Foods, Inc.,* 179 Conn. 471, 427 A.2d 385, 387 (1980)). The claims asserted by plaintiff in this case are particularly suspect because he has advanced the existence of so many different public policies allegedly violated by defendant in terminating his employment. Plaintiff contends that he was fired in contravention of four separate public policies, all relating to public health and safety. As in *McKelvey v. Canteen Corporation,* Civil No. HAR–93–2474, 1994 WL 149606, at *3 (D.Md. Feb. 16, 1994), this Court is here being asked to "pluck out" a public policy from a potential pool of mandates.

■ On the record in this case, the Court concludes that none of the policies relied upon by plaintiff fit within the narrow exceptions to the employment at will doctrine which Maryland cases have recognized. It is apparent that plaintiff's claims are based essentially on his dissatisfaction with the manner in which the Hospital was operating its Cancer Center and the manner in which it was complying with state and federal law. The fact that plaintiff discovered "operational illegalities" and was fired because he intended to "blow the whistle" on his employer is simply not enough to permit the assertion by plaintiff of a claim of wrongful or abusive

discharge. *See Adler III,* 830 F.2d at 1307. Applying the applicable principles to the facts of this case, this Court has concluded that the Hospital's motion to dismiss must be granted.

## IV

### Discussion

Plaintiff Thompson has not alleged that he was fired because he refused to commit unlawful acts. Rather, he claims that the Hospital terminated his employment because he stated his intention to fulfill duties prescribed by Maryland administrative regulations and by Maryland statutes. Accordingly, this Court must determine the nature of these duties and must decide whether to recognize a "new tort" based on one or more clear mandates of public policy which plaintiff claims exist under Maryland law. *See Watson,* 322 Md. at 478, 588 A.2d 760.

### (a)

#### Violations of COMAR

Plaintiff first relies upon COMAR 26.12.01.01, § D.409(b), which provides:

> When a misadministration involves any therapy procedure, the licensee shall notify, by telephone only, the Agency. The licensee shall also notify the referring physician of the affected patient and the patient or a responsible relative or guardian. . . .

These notifications are to be made within 24 hours, or as soon thereafter as practicable. *Id.* Written notification of the misadministration to the DOE is required within 15 days of the telephone report. *Id.,* § 409(c).

■ Plaintiff alleges that he was fired in violation of this regulation's public policy that licensed users of radiation must promptly report misadministrations of radiation.[8] Plaintiff complained to his superiors and eventually to the DOE authorities about these misadministrations. However, it is clear from the language of the regulation at issue that the legal duty to report belonged to the Hospital as the licensee and not to the plaintiff. Plaintiff may have felt morally ob-

---

**8.** An administrative regulation, like a legislative enactment or a prior judicial decision, may be a source of public policy. *Lee,* 91 Md.App. at 830, 605 A.2d 1017.

ligated to report the misadministrations, and indeed his suspicions that the Hospital had not complied with the regulation were later confirmed by a state inspection. Nevertheless, plaintiff was under no legal duty to act as he did, and therefore any public policy embodied in § D.409(b) does not protect plaintiff from discharge.

The decision in *Bleich v. Florence Crittenton Services, Inc.*, 98 Md.App. 123, 632 A.2d 463 (1993), illustrates the flaw in plaintiff's reliance on § D.409(b). In *Bleich*, the plaintiff was a teacher who alleged that she had been fired because she mailed a letter to a state official reporting possible child abuse or neglect at her school. The Family Law Article of the Maryland Code requires a teacher to notify the appropriate authorities if the teacher has reason to believe that a child has been subjected to abuse or neglect. *Bleich*, 98 Md.App. at 136, 632 A.2d 463; Md.Fam. Law Code Ann. § 5–704(a). Moreover, the regulations promulgated pursuant to the relevant statute make clear that the public policy in question involves the protection of children, and that the teaching facility in turn is required to protect the teacher from dismissal or other reprisal for making the report. *Bleich*, 98 Md.App. at 136, 632 A.2d 463; COMAR 07.02.23.01. Since the legal duty was imposed on the plaintiff herself, the Court in *Bleich* concluded that the plaintiff had stated a proper cause of action for wrongful discharge. *Bleich*, 98 Md.App. at 139, 632 A.2d 463.

By way of contrast, plaintiff in this case had no legal duty to report the misadministrations in question. The facts here are therefore clearly distinguishable from those present in *Bleich*, and plaintiff's reliance on that case is misplaced. This Court accordingly concludes that plaintiff cannot base his claim for wrongful discharge on defendant's violation of § D.409(b).

In support of his claim, plaintiff also relies on another COMAR provision which he contends confers on him a specific right the exercise of which resulted in his discharge. Maryland courts have indeed recognized a cause of action for abusive discharge when an employee is fired because he attempted to exercise a statutory right, such as filing a workers' compensation claim. *Ewing*, 312 Md. at 50, 537 A.2d 1173. Plaintiff here argues that he was subject to a retaliatory discharge because he exercised his statutory right to request an inspection by state authorities under COMAR 26.12.01.01, § J.16. Section J.16 is entitled "Requests by Workers for Inspections," and Subsection (a) provides in part:

> Any worker or representative of workers believing that a violation of the Act [9], these regulations, or license conditions exists or has occurred in work under a license or registration with regard to radiological working conditions in which the worker is engaged may request an inspection by giving notice of the alleged violation to the Agency's Chief, Division of Radiation Control.

Section J.16(c) prohibits a licensee from discharging or discriminating against "any worker because such worker has filed a complaint or instituted or caused to be instituted any proceeding under these regulations or has testified or is about to testify in any such proceeding or because of the exercise by such worker on behalf of himself or others of any option afforded by this part."

Plaintiff interprets Subsection (a) to mean that a worker, "believing that a violation of the Act, these regulations, or license conditions exists," may request an inspection. Based on this interpretation, plaintiff argues that the Hospital is prohibited by Subsection (c) from retaliating against him for exercising his statutory right to request an inspection based on his belief that a violation of the Act or the regulations existed.

Plaintiff's interpretation of the regulations in question will be rejected. A fair reading of § J.16(a) as a whole indicates that it applies only to violations "with regard to radiological working conditions in which the worker is engaged." Plaintiff's interpretation is not a reasonable reading of the regulation in its entirety because it improperly separates the phrase "has occurred in work under a license or registration with regard to

---

**9.** Maryland Radiation Act, Md.Envir.Code Ann., §§ 8–101, *et seq.*

radiological working conditions in which the worker is engaged" from the term "exists," which immediately precedes it. Such a construction of the regulation would create separate rules for a violation which "exists" and for a violation which "has occurred." Plaintiff's interpretation thus conflicts with the plain meaning and intent of the regulation. This Court concludes that § J.16(a) gives a radiation worker the right to report a wide variety of violations, but *only* if the violations relate to radiological working conditions in which the worker is engaged.

■ Plaintiff was not in this case concerned with "radiological working conditions" but rather with issues which related to patient care at the Hospital. The Court is satisfied that § J.16(a) does not apply to the circumstances alleged by plaintiff in the complaint and that plaintiff cannot rely upon that Section to establish a clear mandate of public policy.

Moreover, the anti-retaliation provision of § J.16(c) cannot be given the broad construction urged by plaintiff. There is indeed a reference to a discharge because a worker "has filed a complaint or instituted or caused to be instituted any proceeding under these regulations." But, as noted, the regulations in question are concerned in § J.16 only with radiological working conditions. Their provisions do not extend to the entire regulatory scheme under the Maryland Radiation Act. Section J.16 is specifically titled "Requests by Workers for Inspections," and Subsection (c) cannot be construed to apply as broadly as plaintiff suggests.

■ Plaintiff's reliance on *Sheets v. Teddy's Frosted Foods, Inc.,* 179 Conn. 471, 427 A.2d 385 (1980) is misplaced. Unlike the Court of Appeals of Maryland, the Supreme Court of Connecticut approaches the wrongful discharge issue with the stated desire to extend judicial protection to at will employees when their conduct "as good citizens" is punished by their employers. *Id.* 427 A.2d at 388. Much more than being a good citizen

is required by *Adler I* before a wrongful discharge suit may be maintained by an at will employee in Maryland.

■ To summarize, the Court would agree that the overall regulatory scheme of the Maryland Radiation Act indeed places an emphasis on health and safety. However, such a general policy does not constitute a mandate of public policy which is sufficiently clear that it will support plaintiff's claim for wrongful discharge asserted under Maryland law. Moreover, the specific policies in CO-MAR 26.12.01.01, Part J do not apply to plaintiff. Accordingly, the Court concludes that plaintiff has failed to state a claim for wrongful discharge in violation of any public policy embodied in COMAR 26.12.01.01.

#### (b)
#### *Violation of Maryland Statute*

As another theory advanced by plaintiff in support of his wrongful discharge claim, he argues that Maryland public policy requires that the Hospital maintain accurate medical records. In support of this contention, plaintiff relies on standards issued by the Joint Commission on Accreditation of Hospitals ("the JCAH")[10] and provisions of the Health–General Article of the Annotated Code of Maryland. Plaintiff argues that, under § 19–318 of this Article, a Maryland hospital must be licensed, that to be licensed it must be accredited and that § 19–301(b) defines an "accredited hospital" as one accredited by the JCAH. According to plaintiff, defendant Hospital failed to meet JCAH standards when it declined to correct patients' medical records and that it therefore violated Maryland statutory law.

The Court concludes that the policy allegedly violated by defendant is much too general to be considered to be a clear mandate of public policy under Maryland law.[11] This aspect of plaintiff's wrongful discharge claim is similar to the one rejected by the Court in *Hrehorovich v. Harbor Hospital Ctr., Inc.,* 93 Md.App. 772, 614 A.2d 1021 (1992), *cert. de-*

---

10. The JCAH is a national organization which establishes standards for the operation of hospitals. It is not a government body.

11. Accreditation by the JCAH is only one means of securing a license to operate a hospital in Maryland. Md.Health–Gen.Code Ann. § 19–319(c)(2).

*nied,* 330 Md. 319, 624 A.2d 490 (1993). In that case, the plaintiff argued that, under the Health–General Article, there had been a violation by defendant hospital of the public policy of Maryland to promote quality health care. *Id.* at 796, 614 A.2d 1021. The Court in *Hrehorovich* agreed that the promotion of quality health care was a laudable goal, but concluded that it did not constitute a clear mandate of public policy. *Id.* at 797–98, 614 A.2d 1021.

■ Accepting as true plaintiff's allegation that he was fired because of his repeated requests that patients' records be corrected, such a reason for his termination is not in any way related to an effort on plaintiff's part to fulfill a statutorily prescribed duty. *See Adler III,* 830 F.2d at 1307. Plaintiff may have had valid complaints about the Hospital's record keeping, and he may have been acting with the laudable intention of promoting public health, safety and welfare. Nevertheless, the circumstances here are not sufficient to support under Maryland law a claim for wrongful discharge because of the violation of a statutory duty imposed by provisions of the Health–General Article of the Maryland Code. *See, e.g., Bleich,* 98 Md. App. 123, 632 A.2d 463 (statutory duty to report child abuse or neglect); *Moniodis v. Cook,* 64 Md.App. 1, 494 A.2d 212 (statutory prohibition on using lie detector test as a condition of employment), *cert. denied,* 304 Md. 631, 500 A.2d 649 (1985).

### (c)

### *Violation of Billing Requirements*

As a final theory of recovery, plaintiff alleges that he was terminated because he

> advised the Hospital, as he had previously, that certain billing irregularities had occurred regarding the billing of Medicare for services not performed and for services the Hospital was not capable of performing. The Plaintiff was told that any such billing irregularities were none of his business and to forget it. (Complaint, ¶ 24).

In his complaint, plaintiff does not identify any specific statutory policy which the Hospital violated by its billing practices, nor does he explain the specific nature of the "billing irregularities." However, in the memorandum which he has filed in opposition to defendant's motion to dismiss, plaintiff contends that the Hospital was billing Medicare and Medicaid for a complex radiation calculation plan, when in fact a less complex and less expensive calculation was being performed. According to plaintiff, this "up-coding" placed him "potentially at risk" for civil liability under the False Claims Act, 31 U.S.C. § 3729, and for criminal penalties under 42 U.S.C. § 1320a–7b.

■ Assuming that the plaintiff would be permitted by the Court to amend his complaint to allege this violation of federal law as support for his claim of wrongful discharge,[12] his reliance on the False Claims Act must fail. Plaintiff had no involvement whatsoever with billing done by the Hospital and was under no legal duty to report "billing irregularities." Therefore, the suggestion that plaintiff was "potentially at risk" of civil and criminal liability under the False Claims Act is vague, conclusory and speculative. It has not been alleged or suggested that plaintiff refused to engage in illegal activity, namely up-coding. *Compare Kessler v. Equity Management, Inc.,* 82 Md.App. 577, 572 A.2d 1144 (1990) (employee fired because he refused to commit the tort of invasion of privacy of a third person). An amendment alleging that plaintiff would in some way be legally responsible under the False Claims Act for the Hospital's billing irregularities would be insufficient under the circumstances here. In *McIntyre,* 105 Md.App. at 346–47, 659 A.2d 398, the Court of Special Appeals rejected a similar claim of wrongful discharge based on the False Claims Act.

In sum, even if permitted to amend his complaint, plaintiff will not have alleged a proper claim for wrongful discharge based on the False Claim Act.

---

**12.** Clearly, plaintiff has not sufficiently alleged in the complaint filed in this case a cause of action based on the public policy of the False Claims Act. *See McIntyre v. Guild, Inc.,* 105 Md.App. 332, 344, 659 A.2d 398 (1995) (employee must present "clear, specific allegations of fact tending to show that the employer ... violated the legal rule at issue ...").

## V

### Conclusion

For all of the reasons stated, the Court has concluded that, based on the facts alleged, plaintiff cannot establish that he was wrongfully discharged in violation of a clear mandate of public policy. Accordingly, the motion of defendant Hospital to dismiss the complaint will be granted.